# Boyle *versus* The Philadelphia and Reading Railroad Company.

1. By the charter of the Philadelphia and Reading Railroad Company it was provided that the "toll on any property transported should not exceed 4 cents per ton per mile, and on each passenger 2 cents." *Held*, that they might charge for transportation in addition to the toll.

2. The company was incorporated as a railroad and transportation company.

3. The legislature is presumed to have used words in their ordinary signification.

4. "Toll" is a tribute or custom paid for *passage*, not for *carriage;* something taken for a liberty or privilege, not for a service.

5. A corporation authorized to engage in a business, as a necessary incident to their authority has the right ordinarily belonging to such business, and compensation for services is inseparable from the right.

6. When several distinct powers are given by one statute, the restrictions imposed on one are not restrictions on the others.

February 14th 1868. Before WOODWARD, C. J., THOMPSON, STRONG and READ, JJ. AGNEW, J., at Nisi Prius.

Appeal from the decree of the Supreme Court at Nisi Prius.

This was a stockholder's bill by Timothy C. Boyle against The Philadelphia and Reading Railroad Company, and others, managers and officers of said company, setting out the incorporation of the defendants, with authority, by Act of Assembly of April 3d 1833, and other acts, to make a railroad from Philadelphia to Reading and Pottsville, with such powers " as may be necessary or incident to the making and maintaining the said railroad, and the conveyance of passengers and the transportation of the mails and of goods, merchandise and commodities thereon." Also with power " from time to time to ordain and establish rules and regulations for the due ordering of all travelling and transportation on the said road, and for its preservation, with power to alter, repeal, enlarge or amend the said rules and regulations, as they may deem expedient, and that they shall have full power and authority to prescribe the kinds and descriptions of cars, carriages or wagons to be used on the said road for the conveyance of passengers and the transportation of the mails, or of goods, wares, merchandise and minerals, and to regulate the speed at which they shall travel, and to adopt and enforce such rules and regulations in relation to the transit thereof as they shall deem expedient: Provided, that the toll on any species of property shall not exceed an average of four cents per ton per mile, nor upon each passenger an average of two cents per mile."

The bill further set out that the company was required annually to furnish to the legislature " an abstract of the accounts of the company, showing the amount of capital paid in, and the debts of the said company, the amount received for tolls and

transportation, and rates charged, and the amount of dividends declared."

The bill averred that the defendants charge and receive "greater rates and tolls for the conveyance of passengers and the transportation of merchandise, wares and commodities than they are allowed or empowered by their charter to charge or receive, in violation of their said charter," &c., enumerating the rates of charge allowed specifically.

The bill prayed that the defendants may be restrained from collecting greater tolls than their charter authorizes.

The defendants, by their answer, deny that they have charged a greater rate of toll on passengers or property than they are authorized by law to charge; that they are, and have been for many years, engaged in the transportation of merchandise and passengers; "that the sum named in said act as tolls did and does, and always was intended to apply exclusively to that mode of transportation in which the roadway alone was supplied by them, and the motive power and vehicles by the party using the same, and that they have from time to time, in addition to the sum chargeable for tolls, received and collected reasonable and just compensation for the services performed by them in supplying motive power, cars, depots, depot-grounds, agents, needful employees, and loading and unloading, as they may lawfully do. The said charges are and always have been most moderate and reasonable."

The case was heard at Nisi Prius on bill and answer. On the 29th of March 1865 the bill was dismissed with costs, STRONG, J., delivering the following opinion:—

" This case presents the single question whether the Philadelphia and Reading Railroad Company have a right, under their charter, to charge, receive or collect, for the transportation of property carried by them over their road, more than four cents per ton per mile, and more than two cents per mile for conveying each passenger.

" The company was incorporated under an 'Act of Assembly' passed on the 4th of April 1833. It was one of the earliest of corporations of the kind created in this Commonwealth. The 2d section of the act gave it full corporate powers for the purposes for which it was created, with a proviso, however, 'that nothing in this act contained should be considered as giving to the said corporation any banking privileges whatsoever, or any other liberties, privileges or franchises, but such as may be necessary or incident to the making and maintaining of the said railroad and the conveyance of passengers and the transportation of the mail and of goods, merchandise and commodities thereon.'

" By the 11th and 12th sections the company was empowered to locate and construct a railroad from Philadelphia to Reading.

[Boyle *v.* Philadelphia and Reading Railroad Co.]

" The 20th section enacted that it should ' be lawful for the president and managers, from time to time, to ordain and establish rules and regulations for the due ordering of all travelling and transportation on the said road, and for its preservation, with power to alter, repeal, enlarge or amend the said rules and regulations, as they may deem expedient, and that they should have full power and authority to prescribe the kinds and descriptions of cars, carriages or wagons, to be used on the said road for the conveyance of passengers and the transportation of the mails, or of goods, wares, merchandise and minerals, and to regulate the speed at which they shall travel, and to adopt and enforce such rules and regulations in relation to the transit thereof as they may deem expedient: Provided, That the toll on any species of property shall not exceed an average of four cents per ton per mile, nor upon each passenger an average of two cents per mile.'

" The 24th section required the company at the end of the third year after the charter should be obtained, and at the end of every year thereafter, to furnish to the legislature a verified abstract of their accounts, showing the amount of capital paid in and the debts of the company, the amounts received for tolls and transportation, and rates charged and the amount of dividend declared.

" By supplementary acts passed on the 31st of March 1837 and the 20th of March 1838, the company was authorized to extend their road from Reading to the borough of Pottsville, with all the rights, privileges and immunities secured to them by law on other parts of their road and subject to the same liabilities, restrictions and provisions imposed upon them in the first-mentioned act.

" From these provisions of the ' Acts of Assembly,' it is plain that the company was incorporated both as a railroad and a transportation company. As a railroad company they had power to construct and maintain a railroad from Philadelphia to Pottsville and to charge and receive tolls from those who might transport either merchandise or passengers over it. As a transportation company, authority was given them to transport either passengers or the property of others over their own road, in their own cars and with their own motive power. Both these agencies for transportation, that of the company and that of others using the roadway of the company to transport for themselves, were evidently in the mind of the legislature. That it was contemplated others beside the company might use the road after its completion, and might transport upon it their own property as well as passengers, might put cars and carriages upon the road, is beyond question. If not, the entire 20th section of the original act, the Act of 1833, is unmeaning and even absurd. The road was to be a public highway, as truly such as is a canal or a turnpike road, though it

[Boyle *v.* Philadelphia and Reading Railroad Co.]

was placed under the care, management and regulation of its owners. For this reason the company was empowered, from time to time, to ordain and establish rules and regulations for the due ordering of all travelling and transportation on the road, and for its preservation, and to prescribe the kinds and descriptions of cars, carriages or wagons to be used on the road for conveying passengers and transportation of goods, and to regulate the speed at which they shall travel, and to adopt and enforce rules in relation to the transit thereof. This means, beyond doubt, regulations for other transporters, not for themselves. It is a grant of power. No such grant was necessary for their own regulation. To ordain for themselves, to prescribe for themselves and to enforce such ordinances and prescriptions against themselves, if such was the meaning of the legislature, involves an absurdity. A power to prescribe rules implies a superior and an inferior, a lawgiver and a subject. It was, then, travelling by others, transportation by others than the company, which the legislature had in view when this section was enacted, and it was to this section that the proviso upon which the complaint relies was appended. It was of course an exception from the powers previously granted in general terms, a limitation upon the authority to ordain rules and prescribe regulations for the use of the road by others than themselves. It could, therefore, have no reference to their own transportation of property or passengers. The mischief against which it was intended for a guard is readily seen. Having made all others who might desire to become carriers on the road, subordinate to such rules and regulations as the company should prescribe, it was apparent that they might be driven off by the imposition of exorbitant charges. Hence, for their protection, it was provided that, by the rules which the company was authorized to prescribe and enforce upon such persons, no greater toll should be charged than four cents per ton per mile on property and two cents per mile for each passenger. The subject-matter of this section then was the power and right of the company as a railroad corporation. It has no reference to the company as transporters. As such, it neither confers authority upon them nor does the proviso impose a restriction.

" That the proviso was not intended to limit the charges which the company might make in the conduct of their own business as transporters is deducible, also, not only from the fact that it is a restriction upon the power previously given in unlimited terms to prescribe rules for others, an exception out of what without it would have been granted, but from the other fact that it was toll and not freight for which maximum rates were fixed. The legislature must be considered as having used words in the ordinary signification, and especially so when their technical sense and their ordinary signification are the same. The legal meaning of the

[Boyle *v.* Philadelphia and Reading Railroad Co.]

word 'toll' is, and always has been, well defined. It is 'a tribute or custom paid for passage,' not for carriage—always something taken for a liberty or privilege, not for a service ; and such is the common understanding of the word. Nobody supposes that tolls taken by a turnpike or canal company include charges for transportation or that they are anything more than an excise demanded and paid for the privilege of using the way. As already said, the Philadelphia and Reading Railroad Company was one of the earliest companies chartered in this state. Before 1833 transportation had been generally over common roads, turnpikes and canals. The common and the legislative mind were then familiar with what was called tolls. They understood by them, sums paid for liberty of passage without more, and this whether due to a turnpike, a canal or a bridge company. Certainly it was never supposed that tolls were a compensation for the use of carriages, for motive power, for superintendence in transit and for service rendered in transporting, in addition to the liberty of using the way.

"That the word 'toll' as used in the Act of April 4th 1833, does not mean all charges for transportation that may be demanded when the company furnish the road and also the transportation, is still more plain when it is noticed that the legislature, by the act itself, have spoken of amounts received for tolls and amounts received for transportation as different things. The company was required to furnish annually an abstract of their capital, and debts, and the amounts received for tolls and transportation and rates charged. Tolls, transportation and rates, therefore, were understood to be not identical—not the aggregate of receipts was required, but the amounts received from each of the three sources of income ; if the company furnished but roadway, the amount of tolls ; if they furnished motive power, in other words, transported, the amount received from that source ; if they furnished carriages, superintendence, service and roadway, the amount of the rates charged. If 'tolls' mean every possible charge, the requirement to make return of the amounts received for transportation and for rates charged, was, to say the least, superfluous.

"I have examined all the Acts of Assembly which provided for the incorporating railroads enacted prior to April 4th 1833, and in none of them do I find that the legislature confounded 'tolls' with freight or with transportation. In many of them the distinction is very marked. In some there are limits assigned to charges for transportation, but it is always by apt words, never denominating such charges tolls.

"For these reasons I am clearly of opinion that the proviso to the 20th section of the Act of April 4th 1833 has no application

to carriage of passengers or property by the company, and that there is no restriction upon the rates they may charge for roadway use and transportation by themselves. Probably it was deemed unnecessary to impose any such restriction. Excessive rates were guarded against by giving to the public a right to put their own cars and vehicles upon the road without danger of being driven off by exorbitant tolls; and it was well known that competition in carriage of property was inevitable, because a canal had already been constructed, and was in successful operation between Philadelphia and Pottsville. Still another consideration may well be supposed to have had importance in the mind of the legislature. It was, in 1833, impossible to tell from the knowledge then possessed, at what rates transportation of passengers and property could be carried on it.

"I have been referred to a number of English cases, which, it is argued, show that a different meaning has been given by the courts to the word 'tolls' from that which I think it bears in our Act of Assembly. It is urged also that these cases, with a few cited from the decisions in this country, rule that the company can charge for nothing else than for tolls. I have examined all these cases. They have very little bearing upon the question now before me. The English decisions are upon Acts of Parliament —very unlike our Act of Assembly. Some of them relate to improvement (canal or railway) companies, which had no corporate right to transport. Their sole function was to make or maintain a canal or railway. They were not authorized to become carriers. Many English railway companies are created which merely own their roads. They are not allowed to be transporters. Of course they could make no charge except for passage over or through the ways constructed by them. They have no claim to anything but tolls. They render no service, and, which is not to be overlooked in studying these cases under the 'Railways Consolidation Act,' section 2, the word 'tolls' is defined and declared to mean much more than its ordinary legal meaning, and much more than it has ever been understood to signify among us.

"These cases do show, as do the American cases cited, that a canal or railroad company authorized to build a canal or railroad, and to take toll upon goods or passengers transported thereon, can demand no other tolls than such as are allowed to them by the statutes under which they exist. I do not now call that doctrine in question. Applied to this case, it means that the Philadelphia and Reading Railroad Company cannot rightfully demand, from those who carry over their road, more than the Act of Assembly allows. For the use of their way by others no other tolls than such as are allowed, either expressly or by necessary implication, can be tolerated. The right to charge tolls at all is not

[Boyle *v.* Philadelphia and Reading Railroad Co.]

expressly given, but it is an inevitable inference from the words of the proviso to the 20th section.

"But it is said the Act of Assembly gives no power to charge and collect for transportation, and that the right to charge tolls for liberty of passage excludes any right to demand compensation for services rendered in carrying, or for cars or motive power. In support of this is urged the familiar doctrine that corporations have no other rights than such as are expressly given, or given by necessary implication. I recognise the doctrine, and this raises the question whether the right to charge for transportation is necessarily implied in the grant of powers confessedly made. It is clear, as I have already noticed, that the defendants were incorporated not only as a railroad company, to prepare and maintain a highway, but as a transportation company. The regulation and restriction of tolls relates to the former exclusively. No provision was made respecting rates and charges for their own service as carriers; but the very purpose of their incorporation was that they might carry. How can they carry without compensation? Authorized to engage in a business, it is necessarily incident to their authority that they have the rights which ordinarily belong to such a business. As was said by Chief Justice Taney, in one of the cases cited, 'the charter must be fairly examined and considered, and reasonably and justly expounded.' We do not mean to say it is to receive a strained and unreasonable interpretation, contrary to the obvious intention of the grant. To me it seems a most unreasonable construction of the Act of 1833, contrary to the intent of the grant, to hold that the legislature intended to incorporate a transportation company without power to carry on the business appropriate to carriers. Such power is inseparable from a right to demand compensation for their services. The doctrine would lead to most absurd results, and very often defeat the legislative purpose. Can it be that a gas company, authorized to construct gas works and to supply a city with gas, has no right to demand payment for the gas supplied unless the right to demand it is expressly given in the charter? Must a hotel company, authorized to build a hotel and conduct it, receive guests and supply them without charge? Assuredly no. The right to charge is implied in the nature of the business authorized, and I cannot conceive of conducting the business of transportation without the imposition of rates and charges.

"I will, however, pursue this subject no farther. I am of opinion that the rates, tolls and charges imposed and collected by the defendants are not greater than they are authorized by their charter to impose and collect.

"The complainant has, therefore, no equitable right to the injunction for which he asks, nor to any relief. His bill is dismissed, with costs."

[Boyle v. Philadelphia and Reading Railroad Co.]

The complainant appealed, and the error assigned was dismissing the bill.

*S. Dickson*, for appellant.—The claim of the railroad company to charge for transportation is not in any express enactment; there can be no implication of a contract between the company and those using the road. This right of transportation was one of the franchises. Toll is the only compensation expressly given, and it must therefore include compensation for everything they are authorized to do : Camden and. Amboy Railroad v. Briggs, 2 N. J. R. 623 ; Gildart v. Gladstone, 11 East 685 ; Brittain v. Cromford Canal Company, 3 B. & Ald. 139 ; Dock Company v. Browne, 2 B. & Ad. 58 ; Leeds and Liverpool Canal Company v. Hustler, 1 B. & C. 424 ; Stowbridge Canal v. Wheely, 2 B. & Ad. 792 ; Barnet v. Stockton and D. Railway Company, 2 Eng. Railway Cases 440, 442, s. c. 2 M. & G. 163 (40 E. C. L. R. 313) ; Stockton Railway Company v. Barrett, 3 M. & G. 958 (42 E. C. L. R. 497), s. c. 7 M. & G. 877 ; Niblett v. Patterson, 1 Bing. N. C. 81 ; Charles River Bridge v. Warren Bridge, 11 Peters 543 ; United States v. Arredondo, 8 Id. 738 ; Perrine v. Ches. and Del. Canal, 9 Harr. 172 ; Head & Amory v. The Providence Insurance Company, 2 Cranch 127 ; Dartmouth College v. Woodward, 4 Wheat. 636 ; Bank of United States v. Dandridge, 12 Id. 64 ; Bank of Augusta v. Earle, 13 Peters 587 ; Commonwealth v. Erie and N. E. Railroad Company, 3 Casey 351.

*J. E. Gowen* and *Meredith*, for appellees.—" Toll" means a charge for the use of the road, and not for road, cars and motive power : Simpson v. Dennison, 13 Eng. Law & Eq. 365 ; Hunt v. Great Northern Railway Company, 10 C. B. 900 ; Adey v. Dep. Master of Trinity House, 16 Eng. Law & Eq. 125 ; Hodges on Railways 33 ; Redfield on Railways 356. The charter of the defendants discriminates between " tolls" and " rates of transportation :" Act of April 4th 1833, § 24. Words in a statute are to be taken in their usual and best-known signification : Jones v. Harrison, 6 Exch. 333 ; Waller v. Harris, 20 Wend. 555–567 ; Martin v. Hunter, 1 Wheat. 326.

The use of the railroad by other transporters was what the legislature intended to regulate. If " toll" includes charges for transportation, the legislature must have intended to allow as much for the use of the road alone as for road, cars, motive power, &c.

*E. O. Parry*, for appellant, in reply.

The opinion of the court was delivered, April 1st 1867, by

[Boyle *v.* Philadelphia and Reading Railroad Co.]

STRONG, J.—We adopt the opinion delivered at Nisi Prius when the bill of the complainant was dismissed. Nothing in the argument before us has brought us to doubt the soundness of the conclusion then reached. It would be easy to show more fully, were it necessary, that a grant of power to enter into the business of transportation of passengers and merchandise carries with it authority to enter into the contracts by which the business of common carriage is conducted, but it is too obvious to require argument to prove it. And when several distinct powers are given by our statute, as is the case in the act under which the defendants were incorporated, it would be an anomaly in construction to hold that the restrictions imposed upon one power are also restrictions upon the others. In searching for the powers of the defendants as owners of the artificial road, we should be strangely employed were we to inquire what authority was given to them as carriers. And, on the other hand, the extent of their right as transporters is not to be measured by the provisions made respecting their ownership of the road.

The decree made at Nisi Prius, dismissing the complainant's bill, is affirmed, with costs to be paid by the appellant.